UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| RON SATIJA, Trustee of the Bankruptcy Estate of David Mowder and Heather Lynette Mowder,<br><br>Plaintiff,<br><br>v.<br><br>PERMANENT GENERAL ASSURANCE CORPORATION OF OHIO *et al.*,<br><br>Defendants. | CASE NO. 1:13-CV-00082<br><br>OPINION & ORDER<br>[Resolving Doc. 73] |

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

In this copyright action, Plaintiff Ron Satija, the trustee of David Mowder's bankruptcy estate, says that David Mowder created a cartoon character known as the "the General," that the Estate owns the copyright to the General, and that Defendants[1/] have used the character in their advertisements without license.[2/] The Estate seeks damages for Defendants' alleged infringement, the destruction of all infringing material, and an injunction to prevent Defendants' further use of the General.[3/]

Permanent General now moves under Federal Rule of Evidence 702 to stop the expert

[1/] The complete list of Defendants is Permanent General Companies, Inc., Permanent General Assurance Corporation of Ohio, Permanent General Assurance Corporation, PGA Service Corporation, PGC Holdings Corp., General Automobile Insurance Services of Ohio, Inc., General Automobile Insurance Services, Inc., General Automobile Insurance Services of Texas, Inc., General Automobile Insurance Services of Louisiana, Inc., and General Automobile Insurance Services of Georgia, Inc. The Court will refer to them collectively as Defendants or Permanent General.

[2/] Doc. 1.

[3/] *Id.*

testimony of the Estate's two experts.[4] Plaintiff Satija opposes that motion.[5] For the reasons that follow, the Court **DENIES IN PART** Defendants' motion and will set a hearing to consider the admissibility of the testimony of Robert Turner.

## I. Factual and Procedural Background

David Mowder says that in 1998 and while living in Northeast Ohio, he created the cartoon character called the General and that from 1998, Defendants have used the character in their advertisements without his permission or authorization.[6]

Defendants generally say they contracted with an advertising agency, Saifman Richards, and that advertising agency's employee actually created the character.[7] Rather than creating the character, Defendants say its advertising agency hired Mowder as an illustrator of someone else's idea and say Mowder assigned any right he had in the design to Saifman Richards.[8]

The Court scheduled the case for trial on April 28, 2014.[9] The Court ordered the Estate to exchange its expert reports by February 28, 2014,[10] and ordered Defendants to file any objections by March 31, 2014.[11]

The Estate disclosed reports from two experts.[12] Robert Turner authored the first report. The report gives opinions on the gross revenue purportedly attributable to the use of the character in

---

[4] Doc. 73.
[5] Doc. 76.
[6] Doc. 1 at 3 ¶ 5, 8 ¶ 25, 9 ¶¶ 30-35.
[7] Doc. 22 at 12-13 ¶¶ 21-28 (Counterclaim).
[8] *Id.*
[9] Doc. 44 at 4.
[10] Doc. 52.
[11] Doc. 65.
[12] Doc. 63.

Defendants' advertisements.[13] Michael Barone, Ph.D. authored the second report. It deals with the influence of the General character on consumer decisions.[14] Defendants have timely filed an objection to both reports.[15]

Defendants say that both reports are irrelevant and unreliable.[16] In regards to Dr. Barone's report, Defendants say that he failed to rely on proper methodologies to reach his opinion.[17] Turner's opinion, Defendants say, will not assist the jury in this case.[18]

For its response, the Estate says Defendants misunderstands the proper law to be applied, that Dr. Barone's methodologies have previously satisfied legal requirements, and the Defendants objections to Turner's report goes to the weight of evidence, not its admissibility.[19]

## II. Legal Standard

Rule 702 of the Federal Rules of Evidence controls the admission of expert testimony. Under Rule 702, testimony based on specialized knowledge is admissible if it "will help the trier of fact to understand the evidence or to determine a fact in issue."[20] The expert's testimony must also be "based on sufficient facts or data," be "the product of reliable principles and methods,"and be the product of reliable application of those principles and methods to the facts of the case.[21] "[T]he law grants a district court the same broad latitude when [the district court] decides *how* to determine

[13] *Id*. *See generally* Turner Rep.
[14] Doc. 63. *See generally* Barone Rep.
[15] Doc. 73.
[16] Doc. 73-1.
[17] *Id.* at 5.
[18] *Id.* at 12.
[19] Doc. 76 at 3.
[20] Fed. R. Evid. 702(a).
[21] *Id.* 702(b)-(d).

reliability as it enjoys in respect to its ultimate reliability determination."[22] But to qualify as an expert witness, the expert must be qualified "by knowledge, skill, experience, training, or education."[23]

As commentators have noted, Rule 702 liberalized the admissibility of expert testimony from the earlier *Frye* standard.[24] Under this liberal approach, expert testimony is presumptively admissible.[25]

Further, experts need not confine their testimony to matters upon which they have personal knowledge.[26] Experts may base their opinions on facts and data "experts in the particular field would reasonably rely on . . . in forming an opinion on the subject."[27]

For the instant motions, the Court restricts itself to determining whether the experts' purported testimony is admissible. To conduct this inquiry, the Court considers the parties' objections.

**III. Dr. Michael Barone**

Dr. Michael Barone holds a masters in business administration from George Washington University and a Ph.D. in marketing with a psychology cognate from the University of South Carolina.[28] He is currently a Professor of Marketing and a University Scholar at the University of Louisville.[29] He has offered expert opinions on marketing, branding, and consumer psychology in

---

[22] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999).
[23] Fed. R. Evid. 702.
[24] *See, e.g.*, Weinstein's Federal Evidence § 702.02[1].
[25] *Id.*
[26] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993).
[27] Fed. R. Evid. 703.
[28] Barone Rep. at 1 ¶ 3.
[29] *Id.*

twelve other cases.[30/]

In this case, Dr. Barone purports to give an expert report about the influence of the General as used in marketing materials on consumer decisions to purchase Defendants' products, automobile insurance.[31/] He concludes that

> the use of The General Caricature by Permanent General in its advertising has a significant positive influence on consumer decisions to purchase Permanent General's insurance offerings. As a result of this influence, Permanent General's advertisements featuring the General Caricature are reasonably related to Permanent General's gross revenues and profits.[32/]

Defendants challenge Dr. Barone's report because they say "Prof. Barone's assumption of a significant positive influence rests solely on the presence of the General cartoon character in a majority of Permanent General's television ads and the increase in permanent General's advertising budget."[33/] They also say that Dr. Barone "simply did not test his hypothesis with the type of methodology he knows would have" proven his hypothesis.[34/]

Permanent General's challenges to Dr. Barone's expert report lose.

As background, in his report Dr. Barone discusses Permanent General's "direct response strategy" of encouraging customers to "respond 'directly and immediately'" via the Internet or telephone.[35/] He notes Defendants' statements that the General is used in "the vast majority" of Defendants' ads and allows Defendants "to deliver 'a consistent effective message' to consumers."[36/]

---

[30/] *Id.*
[31/] *Id.* at 1 ¶ 1.
[32/] *Id.* at 2 ¶ 5; *see also id.* at 20 ¶ 42.
[33/] Doc. 73-1 at 5.
[34/] *Id.* at 6.
[35/] Barone Rep. at 3-4 ¶ 7.
[36/] *Id.* at 4 ¶ 8.

He also notes that Defendants have said its advertising enables it to achieve "'rapid growth.'"[37]

Dr. Barone then analyzes the character itself. He identifies the "exaggerated features" of the character and portraying the character engaged in activities "that are incongruous with stereotypical views of five-star generals" as "novel images."[38] Literature in the field of marketing says that "novel advertising is highly attention-getting, and greater attention increase an advertisement's impact on consumer decision making."[39]

He also says that memorable characters can "break through 'marketplace clutter'"[40] and make the "brands seem more 'human' to consumers.'"[41] As a human and likeable character, Dr. Barone says that "target consumers are particularly likely to follow the 'call to action' recommended by" the character.[42]

Dr. Barone also concludes that the character and Defendants' use of the character likely improves consumers' memory of the information contained in the advertisements and Permanent General's brand.[43] And Dr. Barone reasons that Defendants use the General on the website as well as in advertisements "ensures continuity across these contact points, increasing the likelihood that prospective customers follow through on the 'call to action.'"[44]

Dr. Barone also concludes that Permanent General's integrated use of related brand elements

---

[37] *Id.* at 6 ¶ 12.
[38] *Id.* at 7 ¶ 15.
[39] *Id.* (citations omitted).
[40] *Id.* at 11 ¶ 22.
[41] *Id.* at 11 ¶ 23.
[42] *Id.* at 12 ¶ 24.
[43] *Id.* at 8 ¶ 17, 10 ¶ 21.
[44] *Id.* at 12 ¶ 25.

increase Defendants return on investment.[45]

Finally, Dr. Barone concludes that increased advertising by Permanent General "can augment the influence of key advertising elements such as The General Caricature on consumer response."[46]

Dr. Barone's conclusion that the General character has a significant positive impact on Permanent General's advertising, therefore, is not solely based on Permanent General's use of the character and increased advertising investment. Rather, Dr. Barone seems to rely upon psychological marketing literature to reach this conclusion.

Although Dr. Barone mentions that Permanent General would not spend so much on advertising if the General were not effective, he uses this common-sense observation as an independent check of his expert hypothesis.[47] An expert is permitted to check his opinion by ensuring it adequately explains other facts in the case.

Defendants' claim that Dr. Barone did not test his conclusion with empirical studies goes to the weight of his conclusion rather than its admissibility. The commentary to Rule 702 merely suggests that the Court consider whether the analytical "technique or theory" has been tested.[48] Here, as Defendants acknowledge, Dr. Barone's theories on psychological marketing have been empirically tested.[49]

Defendants challenge to Dr. Barone's opinion does not seem to criticize his opinion that the character has a positive impact on consumers' opinions of Permanent General. Rather, Defendants

---

[45] *Id.* at 14-15 ¶¶ 29-30.

[46] *Id.* at 16 ¶ 33.

[47] *See id.* at 17 ¶ 36.

[48] Fed. R. Evid. 702 advisory committee's note (2000) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)).

[49] *See* Doc. 73-1 at 7.

seem to be more concerned with valuing the specific impact that the General character has on its advertising, as opposed to other features of the commercial.[50] This states a valid concern. The Court addresses the argument below. But it does not mean that the Court should bar Dr. Barone's expert opinion that the character has *a* positive effect on consumers' opinions of Permanent General and, therefore, "*advertisements* featuring The General Caricature are reasonably related to Permanent General's gross revenues and profits."[51]

For these reasons, the Court overrules Defendants' objections to the expert testimony of Dr. Barone.

**IV. Robert Turner**

Robert Turner is a certified public accountant, holds an accreditation in business valuation, and is certified in financial forensics and valuation analysis.[52] He is a principal in Apple Growth Partners, a business advisory firm that specializes in business valuation and forensic accounting.[53]

In this case, Turner purports to give an expert opinion about "Permanent General's gross revenue attributable to its alleged copyright infringement" or valuing Defendants' use of the General character.[54] He concludes that the gross revenue attributable to the copyright infringement is between 51% and 90% of Defendants' direct retail premiums earned and monetized revenue, between over $450 million and over $800 million.[55]

---

[50] *See id.* at 7-8 ("Prof. Barone further described the method by which he *could* have tested the Permanent General advertising to determine whether and how the various components of the ad (*e.g.*, the jingle, the 1-800 number, the cartoon character) affected consumers positively or negatively or not at all.").

[51] Barone Rep. at 20 ¶ 42 (emphasis added).

[52] Turner Rep. at App'x A.

[53] *Id.*

[54] *Id.* at 1.

[55] *Id.* at 2, 9-11. The exact numbers are $456,383,000 and $805,383,000.

Defendants say that because Turner "provides a range covering approximately $350 million . . . attributable to Defendants' allegedly infringing activity, Plaintiff has failed to establish the actual amount of gross revenues reasonably related to the infringing activity."[56/] The Court construes this cursory argument as a general attack on the valuation of the revenue reasonably related to Defendants' use of the General.[57/]

Turner gives the opinion that between 51% and 90% of Permanent General's revenues result from Permanent General's use of the General character.[58/] Apparently, he comes to this by observing that advertising leads to revenues and the General character appears a majority of the advertising, including television advertising.

Turner, however, seems to have missed an important step in the chain of logic. Although the General character may affect consumer's decisions to purchase, and although advertising may correlate with revenue, Turner cites no evidence or expert opinion to suggest that all of the correlation between revenue and advertising is due to the General as opposed to the other elements of the commercials, such as the jingle or even the insurance service itself.[59/]

Plaintiff appears to recognize this jump in logic and responds that he does not need to

---

[56/] Doc. 73-1 at 12. Defendants also say that Section F of Turner's report is irrelevant. *Id.* Section F of the report discusses the valuation of Defendants' intangible assets. Turner Rep. at 10. The value of the General character, an intangible asset, is potentially relevant to Plaintiff's actual damages under 17 U.S.C. § 504(b). And Turner is an expert in valuation and qualified to give an opinion about the value of an asset. Therefore, the Court overrules this objection.

[57/] *Cf.* Doc. 73-1 at 7-8 ("Prof. Barone further described the method by which he *could* have tested the Permanent General advertising to determine whether and how the various components of the ad (*e.g.*, the jingle, the 1-800 number, the cartoon character) affected consumers positively or negatively or not at all.").

[58/] Turner Rep. at 11.

[59/] Turner cannot rely on the report of Dr. Barone for this because Dr. Barone did not give an opinion about the effects of other features of the advertisements.

consider the effects of other elements of the commercial.[60] Relying on *Balsley v. LFP, Inc.*, 691 F.3d 747 (6th Cir. 2012), Plaintiff Satija says that he just needs to show a "reasonable relationship—relevance, in other words—to the *infringing activity*" and that he does not need to show a "'causal connection.'"[61]

The 1976 Copyright Act[62] gives a copyright owner a right to recover "the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."[63] To establish profits, the copyright owner is required to "present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."[64]

In *Balsley*, a news reporter who held copyrights to pictures sued the owners of *Hustler* magazine for publishing those pictures without her consent.[65] The Sixth Circuit held that she satisfied the prima facie case to recover *Hustler*'s profits reasonably related to the unauthorized use of her pictures when she established the gross revenue earned from the issue in which the pictures appeared.[66] At that time, the burden shifted to the defendant to show how much of its profit was attributable to the pictures themselves as opposed to the other features of the magazine.[67]

For revenue to be reasonably related to an infringement, there must be a conceivable

---

[60] Doc. 76 at 2.
[61] *Id.* (quoting *Balsley*, 691 F.3d at 769 & n.6) (emphasis in original).
[62] 17 U.S.C. § 101 *et seq.*
[63] 17 U.S.C. § 504(b).
[64] *Id.*
[65] 691 F.3d at 754-57.
[66] *Id.* at 770.
[67] *Id.*

connection between the infringement and the revenues.[68/] And the revenue means the gross revenue reasonably related to the infringement, not unrelated revenues.[69/] Finally, a damages cannot rest on mere speculation as to "a causal link between the infringement and the claimed revenues."[70/]

Plaintiff says that he sufficiently shows a "reasonable relationship" between the use of the General character and Permanent General's gross revenue because the General appears in "every single one" of Defendants' advertisements; because Dr. Barone concludes that the General has a positive impact on consumer decisions; and because Turner concludes that Defendants' revenue is strongly correlated with its TV advertisements.[71/]

There are two problems with this argument.

First, Turner's report does not say the he will give an opinion about the revenue reasonably related to the use of the General. Rather, Turner's report says that he is giving an opinion about "the amount of Permanent General's gross revenue *attributable to* Permanent General's alleged copyright infringement of 'The General' caricature."[72/]

As the Sixth Circuit noted in *Balsley*, when a party attempts to show the revenue or profit *attributable to* infringement, it must establish a non-speculative causal connection between the revenue and the infringement.[73/] Turner does not attempt to do so in his report, nor can he as an expert in financial valuation.

Second, Plaintiff's argument may not establish that the revenues are reasonably related to

---

[68/] *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).

[69/] *Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001).

[70/] *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 523 (4th Cir. 2003).

[71/] *See* Doc. 76 at 3.

[72/] Turner Rep. at 11 (emphasis added).

[73/] 691 F.3d at 769 n.7.

infringement. *Balsley* differs from this case significantly. In *Balsley*, the magazine sold pictures and articles. While it owned some of this content, the publisher did not own the Balsley pictures. Therefore, the publisher's revenues from that issue came directly from the sale of the copyrighted images.

In this case, Defendant sells insurance and used the General character to advertise its insurance sales. Customers buy the insurance, not the character. Therefore, the relationship between the alleged infringement and the revenue Turner cites is not as direct.

Nevertheless, Turner's testimony may still be admissible as an opinion about the revenue reasonably related to the use of the General under *Balsley*. But the Court requires additional information from Turner and argument from the parties before the Court can conclude that Turner has used a reliable valuation method and has reliably applied that method to the facts of this case.

The Court will schedule a hearing at which Turner will testify about the basis for his opinion on the value of the revenues attributable to or reasonably related to the use of the General character. The Court will also hear argument on whether Turner should testify and on what issues Turner should be allowed to testify.

## V. Conclusion

For the foregoing reasons, the Court **DENIES IN PART** Defendants' motion.[74/] The Court overrules Defendants' objections to the testimony of Dr. Barone. The Court will schedule a hearing by separate order at which Robert Turner will testify and the parties will present argument concerning the admissibility of his expert testimony.

---

[74/]Doc. 73.

IT IS SO ORDERED

Dated: April 15, 2014

s/ *James S. Gwin*
JAMES S. GWIN
UNITED STATES DISTRICT JUDGE