UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

-------------------------------------------------------
                                              :
RON SATIJA, Trustee of the Bankruptcy         :          CASE NO. 1:13-CV-00082
Estate of David Mowder and Heather            :
Lynette Mowder,                               :
                                              :
            Plaintiff,                         :
                                              :
      v.                                      :          OPINION & ORDER
                                              :          [Resolving Docs. 73, 84, & 91]
PERMANENT GENERAL ASSURANCE                   :
CORPORATION OF OHIO *et al.*,                 :
                                              :
            Defendants.                        :
                                              :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

      In this copyright action, Plaintiff Ron Satija, the trustee of David Mowder's bankruptcy

estate, moves to stop the testimony of Defendants'[1] two experts.[2]  Defendants oppose the motion.

For the reasons that follow, the Court **DENIES** Plaintiff's motion.

      The Court also considers Defendants challenge to Plaintiff's expert, Robert Turner.[3]  Based

on the testimony provided at the hearing, the Court **GRANTS IN PART** and **DENIES IN PART**

Defendants' motion to strike Turner's testimony.[4]  The Court **DENIES** Defendants' motion for

leave to challenge Turner's rebuttal report as moot.[5]

_____

      [1]The complete list of Defendants is Permanent General Companies, Inc., Permanent General Assurance
Corporation of Ohio, Permanent General Assurance Corporation, PGA Service Corporation, PGC Holdings Corp.,
General Automobile Insurance Services of Ohio, Inc., General Automobile Insurance Services, Inc., General Automobile
Insurance Services of Texas, Inc., General Automobile Insurance Services of Louisiana, Inc., and General Automobile
Insurance Services of Georgia, Inc. The Court will refer to them collectively as Defendants or Permanent General.

      [2]Doc. 84.
      [3]Doc. 100.
      [4]Doc. 73.
      [5]Doc. 91.

Case No. 1:13-CV-00082
Gwin, J.

## I. Procedural Background

The Court has recently issued an opinion detailing the factual background of this case and incorporates that background by reference.[6]

Defendants' disclosed reports from two experts. William Baker, Ph.D., authored the first report. The report gives opinions on the effectiveness of the of the General character on Defendants' advertising and the percentage of Defendants' profit attributable to the use of the General in its advertisements.[7]

Michael Einhorn, Ph.D., authored the second report. Dr. Einhorn's report gives opinions on the amount of Defendants' profit that is attributable to the use of the General in Defendants' advertisements.[8]

Plaintiff says that both reports are unreliable and, in a footnote, challenges Dr. Einhorn's qualifications to render an opinion on valuation.[9] Defendants say that Plaintiff's challenges are questions of weight and not admissibility.[10]

## II. Legal Standard

Rule 702 of the Federal Rules of Evidence controls the admission of expert testimony. Under Rule 702, testimony based on specialized knowledge is admissible if it "will help the trier of fact to understand the evidence or to determine a fact in issue."[11] The expert's testimony must also be "based on sufficient facts or data," be "the product of reliable principles and methods," and be the

---

[6] *See* Doc. 87 at 2-3.
[7] *See generally* Baker Rep.
[8] *See generally* Einhorn Rep.
[9] Doc. 84.
[10] Doc. 100.
[11] Fed. R. Evid. 702(a).

Case No. 1:13-CV-00082
Gwin, J.

product of reliable application of those principles and methods to the facts of the case.[12]  "[T]he law grants a district court the same broad latitude when [the district court] decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."[13]  But to qualify as an expert witness, the expert must be qualified "by knowledge, skill, experience, training, or education."[14]

As commentators have noted, Rule 702 liberalized the admissibility of expert testimony from the earlier *Frye* standard.[15]  Under this liberal approach, expert testimony is presumptively admissible.[16]

Further, experts need not confine their testimony to matters upon which they have personal knowledge.[17]  Experts may base their opinions on facts and data "experts in the particular field would reasonably rely on . . . in forming an opinion on the subject."[18]

For the instant motions, the Court restricts itself to determining whether the experts' purported testimony is admissible.  To conduct this inquiry, the Court considers the parties' objections.

### III. Dr. William Baker

Dr. William Baker holds a master's degree and Ph.D. in marketing from the University of Florida.[19]  He is currently a professor of marketing and chair of the marketing department at the

---

[12] *Id.* 702(b)-(d).

[13] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999).

[14] Fed. R. Evid. 702.

[15] *See, e.g.*, Weinstein's Federal Evidence § 702.02[1].

[16] *Id.*

[17] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993).

[18] Fed. R. Evid. 703.

[19] Baker Rep. at 1 ¶ 2.

Case No. 1:13-CV-00082
Gwin, J.

University of Akron.[20]  He previously was a professor at San Diego State University and the University of Vermont and a marketing executive at Nashville, Tennessee, business.[21]

In this case, Dr. Baker gives an expert report expressing his agreement or disagreement with Plaintiff's expert, Dr. Barone.[22]  Dr. Barone gave the opinion that Defendants' use of the General character had a significant positive influence on consumer purchases of insurance from Defendants and that Defendants' use of the General in its advertisements contributed to Defendants' gross revenue and profits.[23]

Dr. Baker's report begins by suggesting that Defendants' investments in its advertising and in the General character do not mean that the character has a significant and positive influence on consumer decisions.[24]  He says that the only way to definitively assess the impact is to conduct "focused research," which Plaintiff has not done.[25]  Dr. Baker then criticizes Dr. Barone's methodology in determining the impact of the character through theoretical means.[26]

The report then considers the results of four meta-analyses.  Based on these meta-analyses, Dr. Baker concludes that "the feelings generated by advertising have little effect on what people think about the brand, what they remember about the brand, or their purchase intentions toward the brand" and that any effect is "very small."[27]  He also concludes that "it is the message and not the

---

[20]/*Id.*
[21]/*Id.*
[22]/*Id.* at 3 ¶ 9.
[23]/*See generally* Barone Rep.
[24]/Baker Rep. at 5-8.
[25]/*Id.* at 8 ¶ 26.
[26]/*Id.* at 8-11.
[27]/*Id.*

Case No. 1:13-CV-00082
Gwin, J.

deliverer of that message that is most important."[28]  Taking all of the research he reviewed into

consideration, Dr. Baker gives the opinion that the overall impact of the General character "is

responsible for about 10% of the effectiveness of Permanent General advertising," although that

effectiveness could 10% higher or 10% lower.[29]

Plaintiff Satija says 1) that Dr. Baker's use of meta-analyses renders his opinion unreliable,

2) that the range of positive impact Dr. Baker finds suggests he is engaging in "scientific

guesswork," 3) that Dr. Baker did not appropriately respond to Dr. Barone's report, and 4) that Dr.

Baker's testimony would confuse the jury about the burdens of proof the parties bear.[30]

The Court finds each objection loses.

First, Defendants correctly point out that the Sixth Circuit has cited meta-analytic studies

favorably as support for a conclusion.[31]  The academic community also uses meta-analytic studies

for a variety of purposes.[32]  Although meta-analysis have risks including those that Dr. Barone

identifies in his rebuttal report, those risks go to the weight that the jury should give Dr. Baker's

testimony, not its admissibility.

Second, the range that Dr. Baker's report yields does not mean he is engaged in scientific

guesswork.  Dr. Baker applied his methodology to the available academic research and came up with

a confidence interval based on that research.  The fact that the confidence interval is high may be a

reason for the jury to disagree with his approach, but it is not an indication that Dr. Baker did not

---

[28]/*Id.* at 12-13 ¶ 37.

[29]/*Id.* at 13-14 ¶ 39.

[30]/Doc. 84 at 8-10.

[31]/*See United States v. Deen*, 706 F.3d 760, 769 n.6 (6th Cir. 2013).

[32]/Reference Manual on Scientific Evidence (Third) at 579 (2011), *available at* http://www.fjc.gov/public/pdf.nsf/SciMan3D01.pdf/$file/SciMan3D01.pdf ("Meta-analysis, . . . a method for pooling the results of multiple studies, sometimes can ameliorate concerns about random error.").

Case No. 1:13-CV-00082
Gwin, J.

apply his method reliably.

Third, the Court disagrees that Dr. Baker did not respond to Dr. Barone's report.  Dr. Baker criticizes Dr. Barone's theoretical approach to determining whether the use of the General had a significant positive impact on consumers.  And he uses a meta-analytic method to give the opinion that, at most, the General has a 10% positive impact on consumer decisions to purchase insurance from Defendants.  Perhaps as importantly, he give the opinion that no expert could determine the General's exact impact without more data.  This report contradicts Dr. Barone's assertion that the General has a significant positive impact on consumers and a large amount of revenues are related to the use of the General.

Finally, the Court disagrees that Dr. Baker's testimony will confuse the jury about the burdens of proof.  Dr. Baker challenges whether Plaintiff shows Defendant profited from using the General.  Dr. Baker says the General has little impact on consumer insurance choices.  And Dr. Baker also gives opinions regarding the character's impact when compared with other advertising factors.  This is relevant to Defendants' burden to show what profit is attributable to their use of the General should they be found liable for copyright infringement.

Accordingly, the Court overrules Plaintiff's objections to Dr. Baker.

### IV. Dr. Michael Einhorn

Dr. Michael Einhorn has a Yale Ph.D. in economics.[33/]  He has testified in cases across the country on damages valuation, including copyright cases.  He has published peer reviewed articles.[34/]  The Court finds that he is qualified to testify as an expert on valuation of copyright damages and can

---

[33/]Einhorn Rep. at App'x A.

[34/]*See id.*

-6-

Case No. 1:13-CV-00082
Gwin, J.

give opinion evidence on what profits are attributable to the use of the General.  The Court overrules

Plaintiff's perfunctory objection.

In this case, Dr. Einhorn gives an expert opinion about the amount of Defendants' profits that

can be attributed to the use of the General character.[35]  Dr. Einhorn concludes that $105,446 is the

amount of Defendants' profit attributable to the use of the General between 2010 and 2013.[36]

To reach this conclusion, Dr. Einhorn finds that Permanent General's revenue from 2010 to

2013 is $945,139,000.[37]   From this revenue, Dr. Einhorn subtracts underwriting losses, of

$509,332,000, and operating expenses, of $422,913,000; this yields a final profit of $12,894,000.[38]

Dr. Einhorn then apportions the amount of profit attributable to advertising by taking the

proportion of advertising expenses to overall expenses, or 33.7%.[39]  Taking this proportion of the

overall profits yields $4,794,000 of profit attributable to advertising.[40]

Dr. Einhorn finally reasons that Permanent General spends 2.2% of its advertising expenses

on artwork, so he finds that the profit attributable to the use of the General is 2.2% of the profit

attributable to advertising, or $105,446.[41]

Plaintiff says that four errors on the report render it unreliable: 1) the fact that Dr. Einhorn

treated monetized revenue as an expense instead of revenue; 2) the fact that Dr. Einhorn deducted

all costs from Defendants' revenue in calculating profit; 3) the fact that Dr. Einhorn used the

---

[35]*Id.* at 3 ¶ 1.1.

[36]*Id.* at 6 ¶ 4.5.

[37]*Id.* at 9 Table 1.

[38]*Id.*

[39]*Id.*

[40]*Id.*

[41]*Id.* at 11 ¶ 8.3.

Case No. 1:13-CV-00082
Gwin, J.

percentage of artwork expenses in Defendants' overall expenses to calculate the proper amount of profits attributable to the use of the character; and 4) the fact that Dr. Baker says no one can definitively apportion the value of the character means all profits are inextricable intertwined and inseparable.[42]

The Court overrules these objections.

First, the Court credits Defendants' representation that Dr. Einhorn's treatment of monetized revenue is consistent with Permanent General's accounting.[43]  Accordingly, the treatment of monetized revenue is a source of disagreement between the experts that the jury can resolve.

Second, Defendants are permitted to deduct their expenses, including the expenses Plaintiff challenges.  Plaintiff's suggestion that the Court should differentiate between direct costs and indirect costs is incorrect and based on the faulty assumption that Permanent General sells "infringing products."[44]  Permanent General does not sell infringing products; Permanent General sells insurance with an advertisement that allegedly infringes Plaintiff's copyright.  Accordingly, all expenses that "contribute to the production and sale" of Defendants' products may be deducted.

Third, Plaintiff's challenge to the method by which Dr. Einhorn allocates the profits attributable to the use of the General should be made to the jury.  Dr. Einhorn implicitly assumes that every dollar spent in costs contributes equally to the profit received.  The jury may or may not agree with that approach, but it is a principled means of allocating profit and is reliably applied to the facts of the case.

---

[42]/Doc. 84 at 11-14.

[43]/See Doc. 100 at 4.

[44]/Doc. 84 at 12 (quoting *In Design v. Lauren Knitwear Corp.*, 782 F. Supp. 824, 832 (S.D.N.Y. 1991)); *see also id.* at 7 (listing cases).

Case No. 1:13-CV-00082
Gwin, J.

Finally, Plaintiff incorrectly argues that Dr. Baker gives the opinion that Permanent General cannot determine the revenue attributable to the use of the General character and should, therefore, pay all its profit to Plaintiff if a copyright infringement occurred.  This misreads Dr. Baker's opinion. Dr. Baker says that without additional tests, no one can *conclusively* say what the impact of the character is, but that "rendered opinions" may have "value" "depend[ing] on the extent to which said opinions link conclusions to reliable data-driven research results."[45/]  This merely means that no one can give a precise value for the impact that character has on advertising; it does not mean that an expert cannot determine the revenue attributable to the use of artwork.

For these reasons, the Court overrules Plaintiff's objections to the testimony of Dr. Einhorn.

### V. Robert Turner

In a previous order, this Court scheduled Defendants challenge to Plaintiff's valuation expert, Robert Turner for hearing.[46/]  The Court could not issue a final decision on the admissibility of Turner's testimony.  In that order, the Court summarized Turner's qualifications as an expert and the analysis of his report.[47/]

At the hearing, Turner reiterated the analysis in his report.  He said that he conducted regression analysis to show that money spent on advertising increased Defendants' revenues.  No big surprise.  But going beyond the unexceptional finding that advertising expenditures increase sales, Turner then concluded that all of Permanent General's revenues were attributable to the use of the General character.  He reduces this only by the percentage of advertising that do not include

---

[45/]Baker Rep. at 4 ¶ 13.

[46/]Doc. 87 at 8-12.

[47/]*Id.*

-9-

Case No. 1:13-CV-00082
Gwin, J.

the General.

Turner also suggested his opinion had some support from a Deloitte valuation performed to justify a party's Permanent General stock purchase.  That Deloitte valuation gave a value for trade marks and trade names, but never gave any separate valuation of the General character.

Turner admitted that his analysis does not account for any other parts of the advertisements featuring the General character.  He testified:

> Q    And so, we're still with the advertising drives revenues is the basis of your opinion, am I correct so far?
>
> A    Statistically confirmed, yes.
>
> Q    Okay.  Now, I think you've also told us, you told me at your deposition, that as far as you know, it would be possible to determine the value of that component and that Dr. Barone might have been one of the people that could have done that, isn't that correct?
>
> A    Dr. Barone, Dr. Braker or Mr. Einhorn, you know, possibly anybody, or by the way, management itself.  Management has not done anything since 2000. So management could have done it, but they didn't do it either.
>
> . . .
>
> Q    Isn't the -- is there anything out there that tells you, gives you any allocation for any value for the cartoon character in the context of the General's advertisements?
>
> A    There's nothing out there that any of the experts of the company that have done to try to segregate the value of the character, apart from, you know, the overall bundle of the brand.

And while Dr. Turner acknowledged that other advertising elements contribute to sales—including music, the website, the 1-800-GENERAL phone number, and most importantly insurance pricing—but he still gives the opinion that revenues all resulted from the General character.

Dr. Turner summarized his opinion:

> Q    But what I'm asking you is, can you as you stand here today, tell me that

-10-

Case No. 1:13-CV-00082
Gwin, J.

> you've got any way of allocating the value of the General in the context of the advertising in terms of a reasonable relationship, can you put a number on that? Yes or no?

> A    We did not run a survey or a study that would differentiate ads with or without it.

The Court needs determine whether his opinion that the General Character alone drives sales is reliable.

Defendants renewed their argument that Turner's method of calculating revenues attributable to the use of the General is unreliable because it is speculative in that it does not account for other features of the advertisements featuring the General character.

For its argument, Plaintiff suggested that they had no burden to account for the impact of other features, as the Estate argued in its brief.

The Estate's argument that it bears absolutely no responsibility for showing a causal link between the revenues and the use of the General loses.

17 U.S.C. § 504(b) establishes a methodology for proving that Defendant profited from any copyright infringement. Section 504(b) requires the copyright owner to only present evidence "of the infringer's gross revenue" from the infringement. The infringer must then show both "expenses" but also the amount of the "profit attributable to factors other than the copyrighted work."[48]

The Sixth Circuit has held that the plaintiff in a copyright case seeking disgorgement of profits must show a "*reasonable* relationship" between revenues and the act of infringement.[49]  To show this reasonable relationship, the plaintiff must present "non-speculative evidence . . . consistent

---

[48]17 U.S.C. § 504(b).
[49]*Balsley v. LFP, Inc.*, 691 F.3d 747, 769 (6th Cir. 2012) (emphasis added).

-11-

Case No. 1:13-CV-00082
Gwin, J.

with general damages principles."[50]  This non-speculative evidence must include "some causal link between the infringement and the particular profit stream before the burden-shifting provisions of [17 U.S.C.] § 504(b) apply."[51]

But here, this begets the question: what profits did the infringement contribute to?  Unlike the defendant publisher in *Balsley v. LPT, Inc.*, Defendants did not sell publications that included Plaintiff's copyrighted material.  Defendants sold insurance.  Even if the General Character helped the advertising and even if the advertising helped insurance sales, is there a reliable basis for saying the General Character resulted in all Permanent General's sales?

The Fourth Circuit dealt with similar issues with a case where the plaintiff said that he held a copyright on a logo used by the Baltimore Ravens.[52]  The plaintiff then contended that § 504(b) allowed him to present evidence of all Ravens sales, both merchandise and non-merchandise, and required the Ravens to come forward with evidence negating the logo's connection with other revenue.  The Fourth Circuit found that the plaintiff could not seek damages for non-merchandise sale and then found that plaintiff offered only speculative evidence to show any connection of the logo to merchandise sales:

> We first consider whether any of the Non-Merchandise Revenues and the Excluded Merchandise Revenues lacked a conceivable connection to the infringement. If so, summary judgment in favor of the Defendants with respect to those revenues was proper. Turning then to the remaining excluded revenues, we inquire whether, despite the existence of a conceivable connection between those revenues and the infringement, Bouchat offered *only speculative evidence of such a causal link* in response to a properly supported motion for summary judgment. If so, then summary

---

[50]/ *Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1280 (M.D. Fla. 2008), *quoted by Balsley*, 691 F.3d at 770.

[51]/ *Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.*, 338 F. App'x 329, 333 (4th Cir. 2009).  The Sixth Circuit has declined to require a causal connection requirement only "to the extent that such a label indicates a burden higher than the one outlined" in the *Balsley* opinion.  691 F.3d at 769 n.6.

[52]/ *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (emphasis added).

-12-

Case No. 1:13-CV-00082
Gwin, J.

judgment in favor of the Defendants was appropriate with respect to these revenues as well.[53]

The court concluded that the plaintiff had not established a causal link between the logo and the team's non-merchandise revenues, even though the logo advertises and represents the team in all of its business ventures.[54]

Therefore, for Turner's testimony to be admissible, he must have a non-speculative basis for concluding that the amount of revenues he identifies is reasonably related to the use of the General. And that requires a causal link between the infringing act and the revenue.

The Court finds that Turner's opinion tying all of Permanent General's revenue to the Character does not satisfy this standard. Turner's testimony that all of Permanent General's revenue flows solely from the General character is not reliable. The causal link between the use of the General and Turner's revenue range is too speculative to conclude that the amount of revenue Turner identifies is *reasonably* related to the use of the General.

As the Court previously noted, the *Balsley v. LPT, Inc.* case does not require a different result.[55] Unlike in *Balsley*, which Plaintiff relies on, Defendants did not sell any allegedly copyrighted material. Instead, Plaintiff's claim is that use of the General character in advertisements encouraged consumers to purchase insurance.

This more tenuous link between the alleged infringement and revenue means that the amount

---

[53]/*Id.* at 523-24; *see also* Bonner v. Dawson, 404 F.3d 290, 294 (4th Cir. 2005) ("We have previously determined that a literal interpretation of gross revenue in § 504(b) to include all profits produced by an infringer, no matter the source, would be incorrect. Rather, gross revenue refers only to revenue reasonably related to the infringement. The copyright owner thus has the burden of *demonstrating some causal link* between the infringement and the particular profit stream before the burden-shifting provisions of § 504(b) apply." (citations omitted)).

[54]/Bouchat, 346 F.3d at 524-25.

[55]/Doc. 87 at 12.

-13-

Case No. 1:13-CV-00082
Gwin, J.

of revenue reasonably related to the alleged infringement is inherently more speculative. Defendants' advertising may have a causal link to revenues but Turner gives no reliable basis to find that all of Permanent General's revenues flowed from the General.  Because Dr. Turner has no reliable basis to attribute all of Defendant's revenue to the General character, the Court grants Defendant's motion challenging that portion of Dr. Turner's testimony.

Turner's report reliably applies a reliable method to determining the causal link between Defendants' advertising and its revenues.  It does not use a reliable method to determine that a causal link exists between the General Character and all of Permanent General's revenue.

Turner admits that he cannot compare the impacts of the various elements of the advertisements on the effectiveness of the advertisements.  Neither can Dr. Barone.  Instead, by not considering those other elements, Turner in effect allocates all of the effectiveness of Defendants' advertisements to the use of the General and ignores the impacts of the other elements.

That one-hundred-percent allocation is speculative in light of other major elements of the advertisement, such as price, Defendants' 1-800 number, and Defendants' jingle.  This kind of speculation does not demonstrate a reasonable relationship between the use of the character and the amount of revenue Turner identifies.

In allocating all of the effectiveness of Defendants' advertisements to the use of the General without any basis to do so, Turner engages in speculation about the causal link between the use of the General and Defendants' revenue; therefore, his opinion as to the amount of revenue reasonably related to the use of the General is not based on a reliable method.

The Court also finds that Turner's treatment of the Deloitte report is similarly based on speculation.  First, the report is hearsay that is likely inadmissible.  Second, the report does not

-14-

Case No. 1:13-CV-00082
Gwin, J.

differentiate among the different types of intangible assets being valued, and Turner can only speculate about how much value the report assigns to the General.[56/]

Therefore, Turner may not testify about what revenue is reasonably related to or attributable to Defendants' use of the General.

However, the Court finds that Turner may testify concerning proper accounting procedures, such as the classification of monetized revenue as profit or an expense, and may testify in rebuttal to the testimony of Dr. Einhorn.

The Court also finds that Plaintiff may still offer evidence about what revenues are reasonably related to the use of the General.  Dr. Barone will testify that the General character has a significant positive effect on the effectiveness of Defendants' advertisements and that, therefore, there is some reasonable relationship between the alleged infringement and Defendants' profits. Plaintiff may then present the amount of Defendants' revenues as allowed by the Copyright Act and rely on the jury to make a common-sense determination of the magnitude of the relationship.

## VI. Conclusion

For the foregoing reasons, the Court **DENIES** Plaintiff's motion.[57/]  The Court overrules Plaintiff's objections to the testimony of Drs. Baker and Einhorn.

The Court also **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to strike the testimony of Robert Turner.[58/]  Turner may not testify about revenues "reasonably related to" or "attributable to" Permanent General's use of the General character, but he may testify as an expert

---

[56/]The Court does not decide the question of whether Defendants' previous parent corporation's profit from the sale of Defendants' and their assets is a profit earned by Defendants and, therefore, recoverable under 17 U.S.C. § 504.
[57/]Doc. 84.
[58/]Doc. 73.

-15-

Case No. 1:13-CV-00082
Gwin, J.

in accounting to rebut Defendants' evidence concerning valuation.  The Court **DENIES** Defendants'

challenge to Turner's rebuttal report as moot.[59]

       IT IS SO ORDERED


Dated: April 25, 2014                                     s/       *James S. Gwin*
                                        JAMES S. GWIN
                                        UNITED STATES DISTRICT JUDGE

---

[59]/Doc. 91.

-16-